**FRANK MALKO,**

   Plaintiff,

v.                                                         Case No. 20-CV-1831

**CGS PREMIER, INC.,**

   Defendant.

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Frank Malko was diagnosed with melanoma in early 2019. At the time, he was employed by CGS Premier, Inc. as a project manager. CGS terminated Malko's employment in February 2020. He now sues CGS for alleged violations of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.*, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 2000, *et seq.*, and the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001 *et. seq.* CGS moves for summary judgment in its favor as to all of Malko's claims. For the reasons stated below, CGS' motion for summary judgment is granted as to Malko's ERISA claim, but denied as to the remaining causes of action.

## FACTS

CGS manufactures vehicles and equipment used in marketing. (Compl. ¶ 7, Docket # 1.) Malko began his employment with CGS in October 2018 as a temporary employee project manager, but became a permanent employee with CGS on January 2, 2019, continuing as a project manager. (*Id.* ¶¶ 8–9.) As a project manager, Malko's responsibilities

included the supervision of his crew (which involved assisting his crew), monitoring the progress on the project, motivating his team, and team conflict resolution. (Def.'s Proposed Findings of Fact ("DPFOF") ¶ 2, Docket # 13 and Pl.'s Resp. to DPFOF ("Pl.'s Resp.") ¶ 2, Docket # 20.) Malko testified that he was diagnosed with melanoma in early 2019. (Declaration of Alan Olson ("Olson Decl.") ¶ 2, Ex. A, Deposition of Frank Malko ("Malko Dep.") at 25, Docket # 25-1.) Bradley Thomas, CGS' plant manager, testified that he recalled Malko informing him of his cancer diagnosis around May 2019. (Olson Decl. ¶ 2, Ex. B, Deposition of Bradley Thomas ("Thomas Dep.") at 14, 27, Docket # 26.) Thomas created a spreadsheet enumerating all of Malko's projects as project manager during his tenure at CGS. (*Id.* at 107, Ex. 4, Olson Decl. ¶ 3, Ex. E at 14, Docket # 31.) Prior to May 2019, Malko worked on ten projects. (*Id.*) Of the ten projects, while the majority were timely completed, half had quality issues such as "fit & finish issues" or "over estimated hours." (*Id.*)

Cindy Schopf, CGS' Vice President and Human Resources Director, testified that Malko informed her of his cancer diagnosis in spring 2019. (Olson Decl. ¶ 2, Ex. C, Deposition of Cynthia Schopf ("Schopf Dep.") at 15, 23, 26, Docket # 27.) She stated that Malko told her that he felt tired and a little sick, but could not recall him mentioning joint pain, headaches, or needing a lighter workload. (*Id.* at 24–25.) Schopf further testified that Malko needed to take time off to attend doctor's appointments and undergo treatment, and that his requests were "more frequent" in "the very beginning" because Malko had to meet with more than one doctor. (*Id.* at 26.) Schopf assisted Malko in applying for short-term disability in May 2019. (*Id.* at 32, Olson Decl. ¶ 3, Ex. E, Docket # 29 at 24.) Schopf further testified that she assisted Malko in completing paperwork for FMLA leave, which he used

2

on an intermittent basis for treatment and recuperation time after treatment. (Schopf Dep. at 33–34.) Malko testified that he was approved for short-term disability in approximately August of 2019, after "exhausting all of [his] vacation [and] sick time." (Malko Dep. at 35, 58.)

From May through September of 2019, Malko worked on seven projects as project manager. (Docket # 31 at 14.) Of the seven projects, four were timely completed and three were not; however, one delay was due to the client. (*Id.*) Three of the seven projects had noted quality issues. (*Id.*) By autumn, Malko's melanoma had metastasized into his lymph nodes, requiring surgery and increased chemotherapy treatments. (Pl.'s Proposed Findings of Fact ("PPFOF") ¶ 5, Docket # 19 and Def.'s Response to PPFOF ("Def.'s Resp.") ¶ 5, Docket # 35.) Malko testified that he began using his FMLA leave in September 2019 (Malko Dep. at 34–35), submitting a form signed by his health care provider on September 10, 2019 (DPFOF ¶ 5 and Pl.'s Resp. ¶ 5). Malko's doctor stated that he would be receiving treatment every four weeks for the melanoma and that he would require time off for frequent scans, labs, and managing the side effects of treatment. (Declaration of Cindy Schopf ¶ 6, Ex. A, Docket # 16-1.)

In autumn, Malko worked on two projects entitled Shalom RV and Harley Black Hive. (Docket # 31 at 14.) Neither project was completed on time and both had issues with fit and finish and hour overages. (*Id.*) Malko testified that the issues with the Shalom RV project stemmed from communication problems with upper management, delays in products, and delays from customer requests. (Malko Dep. at 19.) Malko testified that the Harley Black project also had several issues, specifically: changing design of the project half-

3

way through, an employee accidentally damaging a trailer, and improper ventilation for the paint used. (*Id.* at 18.)

Malko testified that he spoke with CGS regarding his performance, including having a performance review in December 2019. (*Id.* at 22–23.) CGS reviewed Malko's job performance on December 11, 2019, finding that of the 32 items rated pertaining to job performance, Malko received a three, four, or five (the highest rating) for each item reviewed. (PPFOF ¶ 12 and Def.'s Resp. ¶ 12.) However, Malko testified that he was also told that he needed to "up [his] manual labor and work harder." (Malko Dep. at 23.) Malko further testified that towards the end of his projects, he met with Thomas and told him that he believed "things were changing towards [him]" and that he "felt like [he] was going to be terminated." (*Id.*).

Malko worked on the Harley White project in January 2020. (Thomas Dep. at 40.) Towards the end of January 2020, while Malko was in the middle of the Harley White project (Malko Dep. at 23–24, 50), Thomas testified that he, along with Schopf, and Dan Kieliszewski (CGS' Chief Operating Officer), spoke with Malko and his production team regarding the shortcomings with the Harley Black project (Thomas Dep. at 115). Thomas testified that Malko and his team were informed that they needed to improve their performance or there would be "repercussions," up to and including termination. (*Id.*)

After this meeting, Thomas testified that Malko was assigned a "softball project," the Coke DT-8 (reset), which Thomas described as a "very straightforward" project with little hours associated with it. (*Id.* at 117.) Malko testified that the Coke DT-8 project had "many issues," including "a lot of miscommunication in upper management as to which way we were directed to do certain things during the teardown and the rebuild" and the discovery of

4

some major problems requiring restructuring. (Malko Dep. at 15–16.) Malko testified that the issues with this project were caused partially by upper management's miscommunication and partially from work done on the initial build. (*Id.* at 16.)

Thomas testified that the "shortcomings with the Coke project really put [them] over the edge" and that he, Schopf, and Kieliszewski made the decision to terminate Malko's employment. (Thomas Dep. at 118.) An employee warning notice was drafted, dated February 21, 2020, giving Malko a "final warning" due to "substandard work," based on a "failure to complete work product on time." (Olson Decl. ¶ 3, Ex. E, Docket # 29 at 37.) The form stated that the consequence of further infractions was termination. (*Id.*) However, Malko was never given the draft "final warning." Instead, the decision was made to terminate his employment. (Thomas Dep. at 118, Ex. 6.) The decision to terminate Malko's employment was made sometime between the February 21, 2020 draft warning and Malko's actual date of termination, February 24, 2020. (*Id.* at 118–19.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Malko has asserted six claims against CGS. Under the FMLA he has asserted: (1) retaliation and (2) interference. Under the ADA, he has asserted: (3) failure to accommodate, (4) discriminatory discharge, and (5) retaliatory discharge. Under ERISA, he has asserted: (6) retaliatory discharge for asserting entitlement to the employer's welfare benefit. (Pl.'s Br. at 3, Docket # 18.) CGS moves for summary judgment in its favor as to all six of Malko's claims. I will address each in turn.

1. *FMLA Retaliation*

Malko alleges that CGS terminated his employment for exercising his rights under the FMLA. The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this

6

subchapter." 29 U.S.C. § 2615(a)(2). Firing an employee for taking a valid leave falls within this prohibition. *See Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 819 (7th Cir. 2015). Retaliation claims under the FMLA require that: "(1) the employee engaged in statutorily protected activity; (2) the employer subjected her to an adverse action; and (3) the protected activity caused the adverse action." *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018).

To defeat summary judgment on his retaliation claim, Malko needs to submit evidence from which a reasonable juror could conclude that CGS fired him for taking FMLA leave. *See Ortiz v. Werner Enter. Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). The evidence "must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.* While *Ortiz* disposes of the distinction between "direct" and "indirect" evidence, it does not affect the *McDonnell Douglas* burden shifting framework. *Id.* at 766; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Thus, "to the extent [plaintiff] wants to take advantage of it, she retains the initial burden of establishing a *prima facie* case of discrimination." *Mourning v. Ternes Packaging, Indiana, Inc.*, 868 F.3d 568, 570–71 (7th Cir. 2017).

CGS does not challenge the first two elements of Malko's FMLA retaliation claim (Def.'s Br. at 5, Docket # 14); thus, the only issue before me is whether genuine issues of material fact remain as to whether Malko's protected activity caused his termination. Although CGS was aware of Malko's cancer diagnosis in May 2019, the record indicates that Malko did not begin taking intermittent FMLA leave until September 2019. (Malko Dep. at 33–34.) Of the seven projects Malko completed between May 15, 2019 and August

7

2, 2019, Thomas indicates that four were completed on time, two were not completed on time, and one was delayed by the client. (Docket # 31 at 14.) Four of the seven projects had no quality issues. (*Id.*) In fact, CGS does not dispute that prior to Malko's final four projects, Malko "did a good job with most of his projects." (Def.'s Resp. to PPFOF ¶ 12.)

Malko's situation changed, however, in the fall when his melanoma metastasized into his lymph nodes, requiring surgery and increased chemotherapy. (PPFOF ¶ 5.) Malko began taking intermittent FMLA leave to address these issues. (Malko Dep. at 33–34.) Malko's final four projects—Shalom RV, Harley Black Hive, Harley White Hive, and Coke DT-8 (Reset)—all had completion dates between September 2019 and February 2020 (i.e., after Malko began taking intermittent FMLA leave). Again, Thomas testified that prior to the Shalom RV project, the "majority of [Malko's] projects were without any kind of major quality issues or missing deadlines." (*Id.*) Thomas testified that Malko's termination was based on performance issues on his last four projects; specifically, untimely completion and quality issues. (Thomas Dep. at 115.)

While CGS argues that Malko's performance waned during the end of 2019, this time period directly corresponds to when his cancer metastasized and he began taking intermittent FMLA leave. The Seventh Circuit's decision in *Lewis v. Sch. Dist. #70*, 523 F.3d 730 (7th Cir. 2008) is instructive here. Lewis worked as a bookkeeper and treasurer for the Freeburg Community School District. *Id.* at 734–35. The parties agreed that Lewis performed her job "admirably" from 1997 until 2004, when both of her parents became terminally ill. *Id.* at 735. Lewis was absent a total of 72.5 out of 242 workdays in the 2004 fiscal year caring for her parents. *Id.* Lewis began taking intermittent FLMA leave in late 2004, after exhausting her sick and vacation time. *Id.* at 736. While she was taking

intermittent FMLA leave, however, Lewis was still asked to perform all of the functions of a full-time bookkeeper. *Id.* Lewis was eventually removed from her bookkeeper position, her employer stating that "It was determined that you miss too much work to meet the essential functions of your present assignment." *Id.* at 737.

Lewis sued the school district for retaliation under the FMLA, and the district court entered summary judgment in favor of the school district. In overturning the district court's grant of summary judgment, the Seventh Circuit stated as follows:

> A reasonable jury could conclude that the District . . . expected Ms. Lewis to complete all of the duties of a full-time bookkeeper while she was working (and being paid) on an essentially part-time basis. Arguably, when her periods of intermittent leave prevented her from timely completing all of the duties she had performed as a full-time bookkeeper, she was removed from her position. Viewed in this way, a reasonable jury could find that the FMLA leave granted to Ms. Lewis was illusory. If the jury were to take this view of the evidence, the performance problems noted by the district court could not provide a permissible non-discriminatory justification for an adverse employment action; the problems would be, under such circumstances, the direct result of Ms. Lewis' exercise of her FMLA rights.

*Id.* at 743. The court further found that a reasonable jury could conclude that the school district had numerous other options consistent with the FMLA that it could have pursued, such as temporarily transferring her to another position, if she was unable to fulfill the essential functions of her job while taking intermittent FMLA leave. *Id.* The court concluded that "we believe that a jury would be entitled to conclude that the school board and the superintendent held Ms. Lewis to the unrealistic expectation that she should accomplish satisfactorily all of the duties of the bookkeeper position during her period of FMLA-protected intermittent leave. The imposition of such unrealistic expectations, if accepted by the jury, would be relevant and probative evidence of a retaliatory intent." *Id.*

9

Similarly, while CGS asserts that Malko's FMLA absences had no impact on his termination (*see* Thomas Dep. at 122–23), a reasonable jury could conclude otherwise. Thomas testified that projects running behind schedule was not a problem unique to Malko (*id.* at 104); other plant managers also ran behind schedule (*id.* at 105). And during his tenure with CGS, Malko served as project manager on at least four projects that were not timely completed. (Docket # 31 at 14.) Despite this fact, CGS was satisfied with Malko's work up until the Shalom RV project (Thomas Dep. at 105), which happened to correspond with the beginning of Malko's intermittent FMLA leave.

Furthermore, around the time of his December 2019 performance review, Malko testified that he was told that he needed to work harder, be more physical, and be out on the shop floor more, despite informing his employer that he was experiencing joint pain and fatigue, making it more difficult to keep up with the physical aspects of the job. (Malko Dep. at 28.) Thomas testified that he was aware Malko was having difficulty keeping up with the physical aspects of the job due to his cancer treatment. (Thomas Dep. at 126.) And while Thomas denies telling Malko he needed to do more physical labor, he acknowledged that he told Malko in December 2019 that he needed to be on the shop floor with his projects, that he is "a working project manager and expected to be on site." (*Id.* at 127.) The performance review itself, graded on a five-point scale with five being the highest, generally rated Malko at a four or five in most categories; however, Malko was given a three out of five for meeting attendance requirements and for putting "company objectives/vision above personal issues." (Docket # 30 at 22.)

Finally, while working on Shalom RV in August 2019, assistant plant manager Jeffrey Borchardt sent an email to both Malko and Thomas stating: "To be honest, you need

to put more on Shawn right now due to your situation . . . . youre' [sic] the project manager, but he needs to execute the project in your absence." (Docket # 31 at 16.) Although Borchardt was not involved in the decision to terminate Malko's employment, his email to Thomas (who was a decision-maker in the termination) that Malko needed to "put more on" other employees due to Malko's "situation" (Docket # 31 at 16), adds to the reasonable inference that Malko's FMLA protected absences contributed to his inability to timely complete his projects and ultimately his termination.

Thus, a reasonable jury could find that CGS terminated Malko for taking intermittent FMLA leave. As in *Lewis*, if Malko was not meeting his project deadlines due to his FMLA protected absences, CGS could have taken other steps, short of terminating him, to deal with the situation, such as temporarily transferring him to another position that did not require the responsibilities of a project manager. This is especially true as Schopf testified that "job sharing or temporary/alternate work within the employee's skill set" were accommodations available to Malko. (Schopf Dep. at 53.) For these reasons, CGS' motion for summary judgment as to Malko's FMLA retaliation claim is denied.

2. *FMLA Interference*

Malko asserts that by terminating his employment, CGS deprived him of future FMLA benefits to which he was entitled. (Pl.'s Br. at 10.) The FMLA also makes it unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise rights under the FMLA. 29 U.S.C. § 2615(a)(1). To prevail on an FMLA interference claim, the employee must establish that: (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer

11

denied him FMLA benefits to which he was entitled. *Hickey v. Protective Life Corp.*, 988 F.3d 380, 387 (7th Cir. 2021).

CGS does not contest the first four elements of Malko's FMLA interference claim. Rather, it argues that Malko conceded that his FMLA requests were always granted. (Def.'s Br. at 6.) But Malko's interference argument does not stem from his intermittent FMLA leave requests granted *prior* to his termination; rather, he argues that by terminating him, CGS interfered with his right to continue taking FMLA leave. (Pl.'s Br. at 10.) "Firing an employee to prevent her from exercising her right to return to her prior position can certainly interfere with that employee's FMLA rights." *Simpson v. Off. of Chief Judge of Cir. Ct. of Will Cty.*, 559 F.3d 706, 712 (7th Cir. 2009). On summary judgment, the relevant question is whether a jury could find that CGS did not reinstate Malko to his position because he exercised his right to take FMLA leave. *See Goelzer v. Sheboygan Cty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010).

While CGS seems to argue that Malko would have been fired regardless of whether he took FMLA leave because of his performance issues, for the same reasons summary judgment is improper on Malko's FMLA retaliation claim, summary judgment is denied on his FMLA interference claim. While CGS provides one possible explanation for Malko's termination decision (i.e., his failure to complete his final four projects on time and without problems), a jury might believe Malko's explanation that he was fired because CGS was unhappy that he exercised his right to take FMLA leave. Again, Malko was terminated in the midst of taking FMLA leave. Malko testified that he felt an attitude shift and "tension" towards him from upper management after he began taking FMLA leave. (Malko Dep. at 24.) He further submits the declaration of his co-worker, Joel Eisen, who avers that both

12

Thomas and Borchardt expressed frustration with Malko leaving for his cancer treatments. (Declaration of Joel Eisen ¶¶ 8–10, Docket # 24.) In short, given the two competing accounts presented, either of which a jury could believe, summary judgment is not appropriate. CGS' motion for summary judgment on Malko's FMLA interference claim is denied.

    3.    *Failure to Accommodate Under the ADA*

Malko alleges that CGS failed to accommodate his disability by requiring him to engage in strenuous physical labor as part of his position as project manager. (Pl.'s Br. at 13–14.) The ADA prohibits employers from discriminating against qualified employees on the basis of qualified disabilities. 42 U.S.C. § 12112(a). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A).

To succeed on a failure to accommodate claim, a plaintiff must prove that: (1) he is a qualified individual with a disability; (2) his employer was aware of this disability; and (3) his employer failed to reasonably accommodate the disability. *Guzman v. Brown Cty.*, 884 F.3d 633, 642 (7th Cir. 2018). Generally, an employer is not obligated to accommodate an employee's disability until the employee informs the employer of the existence of the disability and requests an accommodation. *Id.*

CGS does not challenge the first two elements of Malko's ADA accommodation claim. Rather, it argues that CGS reasonably accommodated Malko by providing him time off for his medical appointments, treatment, and recovery. (Def.'s Br. at 7.) CGS makes two principal arguments. First, CGS asserts that Malko was never required to perform heavy physical labor as part of his job and second, that even if he was, he never requested any sort of accommodation to address his alleged physical limitations.

Disputes of material fact exist precluding summary judgment on this claim. Regarding Malko's job duties as project manager, Schopf testified that she completed a form for Malko's short term disability application in which she indicated that the physical aspects of Malko's job included standing and/or walking for 5.5 to 8 hours each day and occasionally (meaning .25 to 2.5 hours) lifting over 100 lbs. (Schopf Dep. 52, Ex. 5, Docket # 29 at 101.) During her deposition, however, she testified that she could not recall "why [she] would have checked those boxes" because Malko "wasn't a more of a physical project manager." (Schopf Dep. at 52.) Given this evidence, a reasonable jury could credit Schopf's previous description of Malko's job duties, completed prior to litigation, as opposed to her subsequent testimony.

Regarding his request for an accommodation in the form of reduced physical labor, although both Schopf and Thomas testified that Malko never requested a lighter workload (Schopf Dep. at 25; Thomas Dep. at 128–29), Malko testified that he did, and CGS failed to provide it (Malko Dep. at 51). On the contrary, Malko testified that he was told in December 2019 to "up [his] manual labor and work harder." (*Id.* at 23.)

Furthermore, Thomas acknowledged that Malko told him that his cancer treatments were causing fatigue, headaches, and that he was having difficulty some days keeping up

14

with the physical aspects of the job (Thomas Dep. at 125–26.) Thomas further testified that he told Malko in December 2019 that he needed to be on the shop floor with his projects as he is "a working project manager and expected to be on site." (*Id.* at 127.)

Even if CGS provided Malko with the requested accommodation of time off for treatments and recovery, after an employee discloses his disability, the ADA requires an employer to "engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) (internal citation and quotation omitted). Schopf testified that CGS was capable of providing such physical accommodations as standing and/or lifting restrictions but could not remember if Malko was provided with any such accommodation. (Schopf Dep. at 53–55.) Thus, Malko has presented sufficient evidence for a reasonable jury to believe that he disclosed to his employer that his cancer was affecting his ability to continue with the manual labor aspect of his position and that CGS failed to engage in an interactive process and provide reasonable accommodations. As such, CGS' motion for summary judgment as to the ADA accommodation claim is denied.

4. *ADA Discrimination*

Malko asserts that CGS discriminated against him due to his disability when it terminated his employment. (Pl.'s Br. at 16.) The ADA proscribes an employer from "discriminat[ing] against a qualified individual on the basis of disability" in job application procedures and in the hiring or advancement of employees. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013) (quoting 42 U.S.C. § 12112(a)). An ADA plaintiff must identify a genuine issue of material fact as to whether: (1) he is disabled; (2) he is able to perform the essential functions of the job either with or without reasonable accommodation; and (3) he

15

suffered an adverse employment action because of his disability. *Id.* CGS argues that Malko's ADA discrimination claim fails because he never informed anyone at CGS that he needed an accommodation beyond time off. (Def.'s Br. at 8.) For the same reasons summary judgment is improper on Malko's ADA accommodation claim, summary judgment is also improper on Malko's ADA discrimination claim. As stated above, Malko has presented sufficient evidence for a reasonable jury to believe that he disclosed to his employer that his cancer was affecting his ability to continue with the manual labor aspect of his position and that CGS responded by terminating his employment on the pretextual grounds that he was insufficiently performing his job duties. For this reason, CGS' motion for summary judgment as to Malko's ADA discrimination claim is denied.

     5.     *ADA Retaliation*

Malko further contends that CGS terminated his employment in retaliation for requesting ADA accommodations. The ADA prohibits employers from retaliating against employees who assert their right under the Act to be free from discrimination. *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011) (citing 42 U.S.C. § 12203(a)). Employers are forbidden from retaliating against employees who raise ADA claims regardless of whether the initial claims of discrimination are meritless. *Id.* To prove retaliation under the ADA, a plaintiff must show that: (1) he was engaged in activity protected by the ADA; (2) he suffered an adverse employment action; and (3) there exists a causal connection between the protected activity and the adverse employment action. *Sanford v. Thor Indus., Inc.*, 286 F. Supp. 3d 938, 947–48 (N.D. Ind. 2018). Under *Ortiz*, the standard "'is simply whether the evidence would permit a reasonable factfinder to conclude

that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Id.* (quoting *Ortiz*, 834 F.3d at 765).

CGS argues that Malko never engaged in any protected activity because he did not complain about any lack of accommodation to CGS and thus there can be no causal connection between the termination and the protected activity because there was no protected activity. (Def.'s Br. at 8.) I disagree. For the same reasons summary judgment is not proper on Malko's other two ADA claims, summary judgment is denied as to Malko's ADA retaliation claim. Again, Malko has presented sufficient evidence in which a reasonable jury could conclude that he did seek a reasonable accommodation for his alleged physical difficulties due to his cancer and that CGS terminated his employment under the guise of unsatisfactory work. CGS' motion for summary judgment as to Malko's ADA retaliation claim is denied.

6. *Retaliatory Discharge Under ERISA*

Finally, Malko alleges that CGS terminated his employment for exercising his rights under CGS' ERISA plan. (Pl.'s Br. at 19–20.) Section 510 of ERISA states, in relevant part, that "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." *Little v. Cox's Supermarkets*, 71 F.3d 637, 641–42 (7th Cir. 1995) (quoting 29 U.S.C. § 1140). In enacting § 510, Congress' primary aim was to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights or other benefits." *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998) (internal citations and quotations omitted). "Thus, section 510 of ERISA protects

17

employees against dismissal by employers who seek to limit costs of health benefit plans by preventing the use of such benefits." *Id.*

To prove a violation of § 510, a plaintiff "must establish more than a loss of benefits." *Id.* He must demonstrate that his employer terminated him with the *specific intent* of preventing or in retaliation for the use of benefits. *Id.* In other words, "the plaintiff must ultimately show that a desire to frustrate [the plaintiff's] attainment or enjoyment of benefit rights contributed toward the employer's decision and [the plaintiff] can avoid summary judgment only if the materials properly before the district court, construed sympathetically, allow for such a conclusion." *Id.* (internal citation and quotation omitted).

Malko fails to create a triable issue of fact as to his § 510 claim. Malko merely points to the fact that he was undergoing expensive treatments and that two medical bills, one for $53,312 and one for $29,944.12, were in his employee file. (Pl's Br. at 20.) He surmises that given his termination occurred after his cancer metastasized, requiring further treatment, that CGS discharged him to prevent further expensive health claims. (*Id.* at 21.) Schopf testified that she did not know whether the number and/or the costs of claims filed by CGS' employees effect the company's premium amounts from year to year. (Schopf Dep. at 45–47.) She further testified that the reason two of Malko's medical bills were in his employee file was because CGS reimburses its employees a portion of their deductible; however, she testified that she never requested the employee's actual bills, she only needed the explanation of benefits for the employee to get reimbursed. (*Id.* at 47–50.)

Although at the summary judgment stage I must construe all facts in the record and reasonable inferences in the light most favorable to the nonmoving party, this does not extend to drawing inferences that are supported by only speculation or conjecture. *King v.*

18

Case 2:20-cv-01831-NJ   Filed 01/11/22   Page 18 of 20   Document 36

*Hendricks Cty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020). Malko presents insufficient evidence from which a reasonable jury could conclude that CGS terminated his employment with the *specific intent* of preventing or retaliating against him for filing medical claims. Thus, CGS' motion for summary judgment is granted as to Malko's ERISA claim. This claim is dismissed.

## CONCLUSION

Malko alleges that after learning of his cancer diagnosis, CGS violated his rights under the FMLA by terminating him for taking leave; violated his rights under the ADA by failing to accommodate his physical limitations caused by the cancer and ultimately firing him for requesting the accommodations; and under ERISA by discharging him to prevent further expensive medical claims. While I find Malko fails to establish a dispute of material fact as to his ERISA claim, the record evidence as presented is sufficient for a reasonable jury to determine CGS violated Malko's rights under the FMLA and the ADA. For these reasons, CGS' motion for summary judgment is granted as to Malko's ERISA claim, but denied as to the remaining claims.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendant's motion for summary judgment (Docket # 12) is **GRANTED IN PART AND DENIED IN PART**. The defendant's motion for summary judgment is granted as to plaintiff's ERISA claim. This cause of action is dismissed. However, defendant's motion for summary judgment as to plaintiff's claims under the FMLA and ADA is denied. These claims remain for trial.

**IT IS FURTHER ORDERED** that the clerk of court will contact the parties regarding further scheduling in this matter.

Dated at Milwaukee, Wisconsin this 11th day of January, 2022.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge